## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **GPAT PATTERSON, Ph.D.,** | ) | **Case No.** _____ |
| 515 Roslyn Avenue | ) | |
| Akron, Ohio 44320 | ) | **Judge:** _____ |
| | ) | |
| **Plaintiff,** | ) | **COMPLAINT AND JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **KENT STATE UNIVERSITY,** | ) | |
| | ) | |
| Serve: | ) | |
| Office of General Counsel | ) | |
| Executive Offices, Second Floor | ) | |
| 800 East Summit Street | ) | |
| Kent, Ohio 44242 | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMES NOW,** Plaintiff, GPat Patterson, Ph.D., by and through counsel, and for their Complaint and Jury Demand against Kent State University, states as follows:

### NATURE OF THIS ACTION

1.       By this action, Plaintiff, a transgender person, seeks redress against Defendant, a public research university, for employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. and Ohio Revised Code §4112.01., *et seq*. when Defendant failed to promote Plaintiff on the basis of their sex, gender, gender identity, and gender expression.  Because Defendant is a public institution that receives federal funding from the United States Department of Education, Plaintiff further seeks redress under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and the Equal Protection clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

Plaintiff finally seeks redress for Defendant's breach of its oral agreement to advance and promote Plaintiff in their occupation, employment, and career in violation of Ohio law.

2.      Plaintiff seeks compensatory damages in the form of back and front pay, statutory damages, emotional distress damages, pre- and post-judgment interest, punitive damages, reimbursement of their attorney's fees and costs, and injunctive relief in the form of restoration of the benefits, promotion, and advancement of their employment as promised by the Defendant, and more particularly described below.

**PARTIES, JURISDICTION, AND VENUE**

3.      Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

4.      At all times relevant to this Complaint, Plaintiff, GPat Patterson, Ph.D. has resided in Summit County Ohio.

5.      At all times relevant to this Complaint Defendant, Kent State University has been a public research university with a principal place of business in Portage County, Ohio.

6.      This Court has personal jurisdiction over the parties to this action, and original subject matter jurisdiction over the controversy alleged in the same related to claims under 28 U.S.C. §1331, 42 U.S.C. §1983, and 42 U.S.C. §2000e-5(f)(3).

7.      This Court also has supplemental subject matter jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367.

8.      Venue is appropriate in the United States District Court, Northern District of Ohio, Eastern Division under 28 U.S.C. §1391(b) as the facts, occurrences, transactions,

and series of facts, occurrences, and transactions giving rise to this Complaint took place in this federal judicial District.

**FACTS**

**Dr. Patterson's Impeccable Background and Achievements**

9.      Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

10.     Dr. Patterson is openly transgender and has openly expressed their gender identity at all times relevant to this Complaint.

11.     As used in this Complaint, "they," "them," and "their" pronouns refer to Dr. Patterson unless otherwise indicated.

12.     In 2004, Dr. Patterson earned a Master of Arts in English Literature from Kent State.

13.     Dr. Patterson earned their Ph.D. in sexuality, gender, and rhetoric and a graduate certificate in women's, gender, and sexuality studies from Miami University in 2013.

14.     Dr. Patterson is an accomplished and revered scholar in the fields of rhetoric and Women's and Lesbian, Gay, Bisexual, and Transgender ("LGBT").

15.     Without limitation, since 2002, Dr. Patterson has earned academic appointments in their discipline at Kent State University, Miami University, Ball State University, and Appalachian State University.

16.     Since 2002, Dr. Patterson has received innumerable honors, awards, and recognitions for their academic and professional accomplishments, including without

3

limitation the following:

        A.     Invitations to present their research in important academic journals and publications in their discipline;

        B.     Invitations to speak at prestigious conferences around the United States;

        C.     Invitations to publish in peer-reviewed journals, books, and other publications in their field;

        D.     Editing credits in academic text books in their field;

        E.     Written essays, book reviews, and professional statements connected with their academic research;

        F.     Interviews related to their academic research;

        G.     Refereeing academic conference presentations;

        H.     Giving academic keynotes, lectures, talks, and presentations in panels related to their scholarship; and

        I.     Conducting workshops and other academic events related to their research.

17.    Dr. Patterson's academic and community service in their field is unparalleled.

18.    In 2018, Defendant hired Dr. Patterson as a tenure-track assistant professor in its English Department and as an Affiliate in LGBT Studies at its Tuscarawas, Ohio campus, in part, based on their academic and professional expertise.

4

**Kent State University**

19.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

20.     At all times relevant to this Complaint, Defendant has been a public research university in Kent, Ohio.

21.     Defendant also has regional campuses in Ashtabula, Burton, East Liverpool, Jackson Township, New Philadelphia, Salem, and Warren, Ohio.

22.     Defendant maintains additional facilities in Cleveland, Independence, and Twinsburg, Ohio, New York City, and Florence, Italy.

23.     As of the date of this Complaint, Defendant is the third-largest university in Ohio with an enrollment of over 34,000 students in its campus-wide system, and over 25,000 students at its main campus in Kent.

24.     Defendant is classified by the Carnegie Classification of Institutions of Higher Education among Doctoral Universities as an institution with "very high research activity."

25.     At all times relevant to this Complaint, Defendant has received funding from the United States Department of Education and other public entities.

**Defendant Offers Dr. Patterson a Promotion**

26.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

27.     On November 20, 2020, Dr. Patterson was informed by Defendant's then Director of its Center for Sexuality and Gender Studies ("CSGS"), Dr. Molly Merryman,

5

that she had recommended Dr. Patterson to Dean Mandy Munro-Stasiuk as her replacement for that position.

28.    On January 24, 2021, Dr. Merryman informed Dr. Patterson that Dean Munro-Stasiuk would also ask Dr. Patterson to serve on the Steering Committee for the CSGS Program.

29.    In an April 29, 2021, email exchange, Dean Munro-Stasiuk proposed reducing Dr. Patterson's teaching load by fifty percent to accommodate their work with the current Women's Studies and LGBT studies faculty, and to focus their work on building the CGGS academic degree proposal, and the CSGS Program itself.

30.    In the same email exchange, Dean Munro-Stasiuk agreed that the CSGS Program should be moved onto campus grounds, and suggested that Dr. Patterson's teaching load could be further reduced to accommodate their focus on the same.

31.    When Dean Munro-Stasiuk's formal invitation didn't arrive, as promised by Dr. Merryman, Dr. Patterson approached Dr. Merryman about this omission on March 2, 2021.  Dr. Merryman recommended that Dr. Patterson contact Dean Munro-Stasiuk directly because she was worried that Dr. Patterson had been overlooked.

32.    During a videoconference on March 11, 2021, Dean Munro-Stasiuk asked Dr. Patterson how long it would take them to create a Women and Gender Studies ("WGS") major, and whether they wanted to direct the University's Center for Gender and Sexuality Studies ("CGSS").

33.    Dean Munro-Stasiuk further explained that to accommodate Dr. Patterson's promotion, Defendant would reduce their teaching load by fifty percent.

6

34.     In the same videoconference, Dean Munro-Stasiuk expressed that she intended to transition the CGSS into a non-academic role.  Dr. Patterson responded that their interests leaned toward the creation of the WGS academic major, and that if the Dean wanted them to direct the non-academic CGSS, they'd be open to the same if CSGS remained attached to academic programs.

35.     Dean Munro-Stasiuk concluded the March 11, 2021, videoconference by recommending that Dr. Patterson initiate a tenure transfer process to Defendant's main Kent campus with the Tuscarawas campus Dean, Brad Bielski.

36.     Dean Bielski and Dr. Patterson spoke about Dr. Patterson's tenure transfer to the Kent campus on May 10, 2021.

37.     On May 26, 2021, Dr. Patterson conferenced with Dean Munro-Stasiuk and Dr. Julie Mazzie, in which the Dean orally offered Dr. Patterson the Chair of the CSGS Steering Committee and the WGS Major Committee, which Dr. Patterson accepted. During the same conference, Dean Munro-Stasiuk reiterated Dr. Patterson's future leadership role in the CSGS Department and communicated that Dr. Patterson's tenure transfer process would be complete starting the 2022-2023 school year.

**Defendant Rescinds its Offer to
Promote Dr. Patterson in Favor of
an Unqualified Non-Transgender Candidate**

38.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

39.     On June 2, 2021, Dr. Julie Mazzie informed Dr. Patterson that Defendant had rescinded the promotion promised by Dr. Munro-Stasiuk.

40.     On June 10, 2021, Dean Munro-Stasiuk informed Dr. Patterson that the reason for this rescission was that an unspecified person expressed "worry" that Dr. Patterson would "erase women" in the WGS curriculum.

41.     On June 11, 2021, Dr. Patterson corresponded with Dean Munro-Stasiuk to express concern over a Title IX violation, in terms of discrimination against transgender persons in the CSGS curriculum, to which they received no response.

42.     On June 16, 2021, Dr. Mazzie, who is neither transgender nor a gender and sexualities studies scholar with any relevant background in that discipline, informed Dr. Patterson that she would chair and appoint CSGS leadership roles, which Dean Munro-Stasiuk offered to Dr. Patterson during the May 26, 2021, conference.  Dr. Mazzie further declared that Dr. Patterson would no longer be the CGGS Director contrary to Dean Munro-Stasiuk's offer.

43.     In a series of subsequent conversations between Dr. Patterson and Vice President of Diversity, Equity, and Inclusion ("DEI"), Dr. Amoaba Gooden, Dr. Gooden agreed that Dr. Patterson should meet with Dean Munro-Stasiuk and Dr. Mazzie to discuss the series of discriminatory actions that led to the sabotage of Dr. Patterson's leadership and tenure track orally promised by Defendant.  In those conversations, Dr. Gooden noted that Defendant had a track record of disregarding LGBT Studies expertise in general.

44.     During a July 6, 2021, video conference attended by Dr. Patterson, Dr. Gooden, and non-tenure track faculty members Lauren Vachon and Professor Suzanne Holt, Dr. Gooden suggested that she conference with Dean Munro-Stasiuk and Dr. Mazzie

in her capacity of Director of DEI along with Ms. Vachon and Professor Holt to get to the bottom of Defendant's discriminatory treatment of Dr. Patterson.

45.     Dr. Gooden further expressed that she'd contact Dean Munro-Stasiuk to modify an upcoming July 16, 2021, conference with Dr. Gooden, Dean Munro-Stasiuk, Dr. Mazzie, and Dr. Patterson to include the participation of Ms. Vachon and Professor Holt to discuss Defendant's discriminatory treatment of Dr. Patterson.

46.     Subsequently, Dr. Patterson contacted Dr. Charmaine Crawford, a WGS expert who had also been excluded from CSGS leadership conversations to inform her of the direction of CSGS and the WGS major, and to invite her to the July 16, 2021, conference.

47.     On July 14, 2021, Dr. Patterson emailed Dean Munro-Stasiuk's Office to address the exclusion of Ms. Vachon and Professor Holt from the previously-circulated agenda for the July 16, 2021, conference.  In the same email, Dr. Patterson noted that Dr. Crawford should also be included in the July 16, 2021, conference.  Dean Munro-Stasiuk responded that the conference would include only Dr. Patterson as a representative of the Women and Gender Studies Program.  Not wanting to exclude Ms. Vachon, Professor Holt, and LGBT-identifying Dr. Crawford, Dr. Patterson requested that the conference be postponed to a mutually convenient time to include their input.

48.     That day, Dean Munro-Stasiuk retaliated against Dr. Patterson by informing the American Association of University Professors that Defendant had stripped Dr. Patterson of what remained of Dr. Patterson's leadership responsibilities, which Grievance Chair, Dr. Theresa Walton-Fisette, correctly identified as discrimination based

on Dr. Patterson's sex, gender, gender identity, and gender expression.

49.    On July 19, 2021, Dean Munro-Stasiuk emailed Dr. Patterson to inform them that she was further retaliating against them removing them from what remained of the initial oral agreement between Defendant and Dr. Patterson: the fifty-percent lift of Dr. Patterson's teaching load.

## Dr. Patterson Pursues the Transfer of Their Tenure to Defendant's Main Campus

50.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

51.    Upon absorbing the retaliation levied by Dean Munro-Stasiuk identified above, Dr. Patterson elected to pursue the transfer of their tenure to Defendant's English Department, which their colleagues enthusiastically had supported for two years.

52.    Indeed, on September 24, 2019, Dr. Patterson conferenced with then-English Department Chair Dr. Robert Trogdon who noted that Defendant's Reappointment, Promotion, and Tenure ("RPT") Committee was impressed with Dr. Patterson's file.

53.    Dr. Trogdon further expressed that there was a general consensus that Dr. Patterson would be an appropriate fit for the University's main campus, where they could continue pursuing their research and return to teaching graduate students, as they had at their previous tenure-track position at Ball State University.

54.    Along these lines, on August 17, 2020, Dr. Patterson conferenced with Defendant's then-new English Department Chair Dr. Babacar M'Baye. Dr. M'Baye agreed with Dr. Trogdon's assessment that Dr. Patterson should transfer their tenure to

10

Defendant's main campus noting the impressiveness of their *curriculum vitae* ("CV").

55. During the same conference, Dr. M'Baye explained that if Defendant's main campus didn't initiate the transfer process soon, Dr. Patterson would be poached by another institution to Defendant's detriment.

56. To that end, Dr. M'Baye proposed that Dr. Patterson initiate the tenure transfer process in Fall 2020 so that they could be fully transferred to the main campus by Fall 2021.

57. According to Dr. M'Baye, all that was needed to process Dr. Patterson's tenure transfer was a letter of support from Defendant's Literacy, Rhetoric & Social Practice ("LRSP") Program.

58. Later, however, English Department Committee member, Dr. Jen Cunningham objected to the process of initiating Dr. Patterson's tenure transfer request before they were awarded tenure.

59. Therefore, on July 13, 2021, Dr. Patterson initiated their tenure transfer discussions with Dr. M'Baye, who assured them of enthusiastic support.

60. Dr. Patterson's transfer was also supported by the Chair of Defendant's Rhetoric and Composition ("LRSP") Program, Dr. Pamela Takayoshi, who wrote a letter of support for Dr. Patterson's tenure transfer application.

61. Dr. Takayoshi noted in July 2021, that the English Department's tenured faculty were unanimously positive and overwhelmingly impressed by Dr. Patterson's skill, accomplishments, and expertise.

62. On September 2, 2021, Dr. Patterson submitted their tenure transfer

request as instructed.

63.     Dean Brad Bielski confirmed, on September 13, 2021, that the Tuscarawas campus faculty senate unanimously approved Dr. Patterson's tenure transfer request.

### Kent State Denies Dr. Patterson's Tenure Transfer Request on Pretextual Grounds

64.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

65.     On September 24, 2021, Kent State's Faculty Affairs Council ("FAC") and Reappointment, Promotion, and Tenure ("RPT") Committees held a vote on Dr. Patterson's transfer request.

66.     That evening, however, Dr. Trogdon informed Dr. Patterson that he was saddened to report that the outcome of the vote was not in Dr. Patterson's favor.

67.     At that point, Dr. Trogdon was a member of Defendant's RPT Committee.

68.     Dr. Trogon further expressed that he was troubled and disappointed that his colleagues focused on Dr. Patterson's "personality," rather than their impeccable qualifications when discussing their tenure request application, in violation of the English Department's own policies and procedures.

69.     Along these lines, the Committees met simultaneously, and deliberation did not include a **mandatory** discussion of Dr. Patterson's research, service, teaching, and scholarship (the sole criteria on which their application was supposed to be evaluated, per the department handbook, university policy register, and the collective bargaining agreement).

12

70.     The Committees' behavior in this regard suggests a discriminatory motive because, in the fall of 2020, it reported only glowing statements about Dr. Patterson's qualifications, and noted that they meet the requirements for tenure on Defendant's main campus.

71.     Notably, Defendant's Collective Bargaining Agreement ("CBA") requires (a) that all ballots related to tenure requests be documented in writing; (b) and that all RPT Committee members sign their votes and justify their decisions in writing, none of which occurred with Dr. Patterson's tenure transfer request.

72.     Indeed, the deliberate failure of the RPT Committee to document its pretextual justification for denying Dr. Patterson's tenure transfer request also negatively impacts Dr. Patterson's career advancement and will continue to do so, because that body is the same Committee that would be charged with promoting them to full professorship.

73.     In short, the RPT Committee's pretextual sabotaging of Dr. Patterson's tenure transfer request in 2021, **also blocks** their **future ability** to advance their professional standing and increase their salary by transferring their tenure to Defendant's main campus.

74.     The only action recorded in writing by the Committee, however, was a request that votes be tallied anonymously, a further violation of the CBA and the English Department's own policies and procedures, and a further suggestion of discriminatory motive.

75.     Defendant's Dean's office was then alerted to the breach in protocol that led to the denial of Dr. Patterson's tenure transfer request as described above.

13

76.     Upon the same, the Dean's office failed to familiarize itself with University and department policies regarding tenure transfer criteria, and/or deliberately ignored those policies.

77.     The Dean's office further failed to review Dr. Patterson's file, which by any objective measure, demonstrates that their qualifications exceed Kent State's tenure transfer qualifications.

78.     Instead, the Dean's office offered to sit in on a "do over" of the vote on Dr. Patterson's tenure transfer application, proclaiming that its presence would ensure that the Committees observed University policy and that the review process would be above-board.

79.     The "redo" vote was held on October 1, 2021.

80.     At that gathering, despite the promises of the Dean's Office, Dr. Trogdon confirmed that the RPT Committee denied Dr. Patterson's transfer request on the false and pretextual oral assertion that their University service "had changed" after they earned tenure, and before the Committee voted on their tenure transfer.

81.     The nature of the "change" in Dr. Patterson's service, however, was related to the discrimination they suffered during the CSGS debacle identified above, and months of panic attacks suffered by Dr. Patterson as a direct result of the same.

82.     Notably, this allegedly adverse "change" in Dr. Patterson's University service appears nowhere in writing in their file.  Had the RPT Committee properly documented its supposed objection to the alleged "change" in Dr. Patterson's University service, Dr. Patterson would have had direct recourse to challenge Defendant's denial of

14

their tenure transfer request.  This is because University and CBA policy instructs that University service is to be analyzed cumulatively rather than by self-servingly analyzing a snapshot in time.

83.     Defendant's reliance on the alleged "change" in Dr. Patterson's University service, coupled with its deliberate failure to document the same further suggests (a) its discriminatory motive in denying their tenure transfer request, and (b) its eagerness to latch on to any pretextual justification to conceal its unlawful conduct.

84.     Regardless, the Committee's flimsy and pretextual justification for denying Dr. Patterson's tenure transfer request flies in the face of the objective fact that Dr. Patterson's service still far and away exceeded Defendant's tenure transfer requirements.

85.     Predictably, the Dean's office rubber-stamped the second vote as legitimate and relied on the same as the justification for denying Dr. Patterson's tenure transfer request.

86.     The RPT Committee never supplied Dr. Patterson with a written explanation of why their qualifications didn't meet its standards.

87.     At the time of their requests for promotion and tenure transfer identified above, Dr. Patterson was Kent State's only openly transgender tenured professor.  They were, and remain, the most objectively qualified person for the promotions and advancements for which they applied, as noted repeatedly by Defendant's own faculty, and the renowned faculty of other Universities.

88.     Without limitation, the following esteemed academics offered letters of support on behalf of Dr. Patterson's efforts:

A.      Dr. Takayoshi;

B.      Malea Powell, Professor of Research, College of Arts & Letters, American Indian & Indigenous Studies Program, Michigan State University, and Editor, *College Composition & Communication*; and

C.      Staci M. Perryman-Clark, Ph.D., Professor of English and Gender and Women's Studies, Western Michigan University, then-Assistant Chair-Elect, Conference on College Composition and Communication.

89.     In addition, on or about December 22, 2021, upon a review of their file, a murderer's row of accomplished academics and professionals unanimously and unequivocally concluded that Dr. Patterson "**exceeds** all expectations as laid out by Kent State University's criteria for tenure at the main Kent State campus," and tendered the same to Defendant (emphasis supplied).

### CAUSES OF ACTION

### <u>Count I</u>
### Violation of 42 U.S.C. §2000e, *et seq*. and
### Ohio Revised Code §4112.01, *et seq*.

### Discrimination and retaliation based on
### sex, gender, gender identity, and gender expression

90.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

91.     As an openly transgender person, Plaintiff has been a member of a protected class within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. ("Title VII") the Ohio Civil Rights Act and Ohio Revised Code §4112.01, *et seq*. ("OCRA") at all times relevant to this Complaint.

16

92.     At all times relevant to this Complaint, Defendant knew that Plaintiff was a transgender person and member of a protected class within the meaning of Title VII and the OCRA.

93.     Defendant was an "employer" at all times relevant to this Complaint within the meaning of Title VII and the OCRA.

94.     Plaintiff was an "employee" and "employed" by Defendant at all times relevant to this Complaint within the meaning of Title VII and the OCRA.

95.     Plaintiff was objectively qualified for the hiring, benefits, promotions, and professional advancements associated with their employment, promised promotions, and tenure advancements associated with their employment as described in this Complaint within the meaning of Title VII and the OCRA at all relevant times.

96.     Title VII and the OCRA prohibit Defendant from discriminating against Plaintiff on the basis of their sex, gender, gender identity, and gender expression in the hiring, benefits, advancement, and promotion of their profession and employment as described in this Complaint.

97.     Title VII and the OCRA further prohibit Defendant's evaluation of Plaintiff's employment by assuming or insisting that they match stereotypes associated with their group.

98.     As described in this Complaint, however, Defendant took several adverse employment actions against Plaintiff in the hiring, benefits, advancement, and promotion of their employment within the meaning of Title VII and the OCRA on the basis of their sex, gender, gender identity, and gender expression.

99. For example, and without limitation:

A. As described in this Complaint, Defendant failed to promote Plaintiff to positions for which they were objectively the most qualified candidate despite making non-conditional promises and unconditional offers to ascend Plaintiff to those positions, including without limitation the benefits and professional advancements associated with same;

B. As described in this Complaint, Defendant assigned the benefits, professional advancements, and promotions it promised and offered to Plaintiff without conditions, and for which they were and remain the objectively most qualified candidate, to a non-transgender persons or persons, not in the same protected class under Title VII and the OCRA;

C. As described in this Complaint, Defendant assigned the benefits, professional advancements, and promotions associated with the promises and offers it unconditionally made to Plaintiff, to a candidate or candidates, who lacked Plaintiff's objectively superior qualifications;

D. As described in this Complaint, Defendant failed to adhere to its own CBA, policies, and procedures when considering Plaintiff's tenure transfer request; and

E. As described in this Complaint, Defendant failed to grant Plaintiff's tenure transfer request despite Plaintiff meeting all of Defendant's criteria.

100. By its acts and omissions described in this Complaint, Defendant unlawfully discriminated against Plaintiff, and continues to do so, in the benefits, advancements, and promotions of their employment on the basis of their sex, gender, gender identity, and

gender expression in violation of Title VII and the OCRA.

101.   Defendant's discriminatory acts and omissions on the basis of Plaintiff's sex, gender, gender identity, and gender expression as described in this Complaint were intentional and deliberate within the meaning of Title VII and the OCRA.

102.   Defendant's stated reasons for depriving Plaintiff of the benefits, advancements, and promotions associated with their employment as described in this Complaint, were and remain false and pretextual within the meaning of Title VII and the OCRA.

103.   Defendant's stated reasons for depriving Plaintiff of the benefits, advancements, and promotions associated with their employment as described in this Complaint, served no legitimate business purpose within the meaning of Title VII and the OCRA.

104.   As a direct and proximate result of Defendant's violations of Title VII and the OCRA as described in this Complaint, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### Count II
**Denial of Substantive and Procedural Due Process under the Fifth and Fourteenth Amendments to the United States Constitution**

**U.S.C. §1983, *et seq.***

105.   Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

106.   The Fifth and Fourteenth Amendments to the United States Constitution state in pertinent part that Dr. Patterson shall not be "deprived of ... property, without

due process of law."

107.    The Fifth and Fourteenth Amendments to the United States Constitution are enforceable by Dr. Patterson against Defendant under 42 U.S.C. §1983 ("Section 1983").

108.    Section 1983 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

109.    At all times relevant to this Complaint, Defendant was a state actor.

110.    At all times relevant to this Complaint, Defendant was acting in its capacity as a state actor under color of law.

111.    Without limitation, Defendant deprived Dr. Patterson of their rights, privileges, and/or immunities secured by the Constitution and laws in the manner described in this Complaint, by, without limitation, by (a) unlawfully discriminating against them in violation of Title VII and the OCRA on the basis of their sex, gender, gender identity, and gender expression, and (b) failing to comply with its own policies and procedures in considering the benefits, advancements, and promotions of Plaintiff's employment.

112.    By its acts and omissions identified in this Complaint, Defendant deprived Plaintiff of their substantive due process rights in their property interest in their reasonable and objective expectation of professional reputation and reasonable

advancement in their career and employment.

113.    Defendant's acts and omissions described in this Complaint violated clearly established Constitutional law; thus, it is not entitled to qualified immunity under the Eleventh Amendment to the United States Constitution.

114.    As a direct and proximate result of Defendant's violations of Plaintiff's rights arising under the Substantive and Procedural Due Process clauses of the Fifth and Fourteenth Amendment to the United States Constitution as described in this Complaint, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### Count III
### Denial of Equal Protection under the Fourteenth Amendment to the United States Constitution

### U.S.C. §1983, *et seq.*

115.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

116.    Plaintiff has the individual right under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to be free from disparate treatment and discrimination on the basis of sex, gender, gender identity, and gender expression in public employment.

117.    The Equal Protection Clause states that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

118.    Under the Equal Protection Clause, discrimination and disparate treatment based on sex, gender, gender identity, and gender expression is presumptively

unconstitutional and subject to intermediate scrutiny.

119.   The Equal Protection Clause is enforceable by Plaintiff under Section 1983.

120.   Equal Protection analysis under Section 1983 on the basis of Plaintiff's sex, gender, gender identity, and gender expression mirrors the analysis of Plaintiff's allegations of discrimination and retaliation in violation of Title VII on the same basis.

121.   Defendant's discrimination against Plaintiff on the basis of sex, gender, gender identity, and gender expression as described in this Complaint was not substantially or rationally related to any legitimate government interest.

122.   Defendant, acting under color of law, subjected Plaintiff to violations of their liberty and property interests in the benefits, advancement, and promotion of their career, profession, and employment by, without limitation, failing to comply with its own procedures, engaging in direct and/indirect discrimination of Plaintiff in the manner described in this Complaint, and by and failing to ensure that the effects of its discrimination were fully remedied.

123.   Defendant's discrimination against Plaintiff on the basis of sex, gender, gender identity, and gender expression as described in this Complaint violated their constitutionally-protected property interest in their occupation and employment, and the advancement and promotion of the same.

124.   Defendant's acts and omissions described in this Complaint further deprived Plaintiff of their right to equal dignity and liberty by treating them as a second-class citizen.

125.   Plaintiff was purposefully and intentionally denied protection under the

22

Fourteenth Amendment by Defendant in the form of unlawful discrimination based on their sex, gender, gender identity, and gender expression as described in this Complaint because they are transgender.

126.    This selective and pretextual treatment of Plaintiff by Defendant as described in this Complaint was related to Defendant's unlawful desire to perpetuate discriminatory gender stereotypes, irrational fears of transgender persons, and discrimination against transgender employees, and was not substantially or rationally related to any legitimate state or governmental interest, in violation of the Equal Protection Clause of the Fourteenth Amendment in that a governmental actor may not selectively deny protective services to certain disfavored minorities.

127.    Defendant's acts and omissions described in this Complaint violated clearly established Constitutional law; thus, it is not entitled to immunity under the Eleventh Amendment to the United States Constitution.

128.    As a direct and proximate result of Defendant's violations of Plaintiff's rights arising under the Equal Protection clause of the Fourteenth Amendment to the United States Constitution as described in this Complaint, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

**Count IV**
**Breach of Oral Agreement**

129.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

130.    Defendant's offers of benefits, advancement, and promotion of Plaintiff's employment, and Plaintiff's acceptance of the same constitutes a valid and enforceable

23

oral agreement under Ohio law.

131.    At all times relevant to this Complaint, Plaintiff complied with their obligations under their oral agreement with Defendant.

132.    As described in this Complaint, when Defendant rescinded its promised advancement of Plaintiff's benefits, advancement, and promotions of their employment, Defendant breached its oral agreement with Plaintiff.

133.    As a direct and proximate result of Defendant's breach of its oral agreement described in this Complaint, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, GPat Patterson, Ph.D., prays for judgment against Defendant Kent State University as follows:

A.  Compensatory damages;

B.  Damages in the form of back pay;

C.  Damages in the form of front pay;

D.  Damages in the form of emotional distress;

E.  Statutory damages;

F.  Injunctive relief by (i) enjoining Defendant, its agents, successors, and employees from continuing or maintaining the policies, practices, customs, and usages of denying, abridging, withholding, conditioning, limiting, or otherwise interfering with Plaintiff's right to employment, advancement, and promotion of their employment on the basis of sex, gender, gender identity, and gender

expression and the right to equal opportunities for employment as secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*., Ohio Revised Code §4112.01, *et seq*., and the Fifth and Fourteenth Amendments to the United States Constitution; and (ii) enjoining Defendant, its agents, successors, and employees from continuing to discriminate against Plaintiff in the terms and conditions of their employment, in the form of restoring them to the benefits, positions, advancement, and promotion of their career as unconditionally offered and promised by Defendant.

G.  Equitable relief;

H.  Pre- and post-judgment interest on all damages;

I.  An award of their attorney's fees, and costs;

J.  An award of punitive damages; and

K.  Such other relief the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Justin Whittaker*
Justin Whittaker, Esq. (0093212)
WHITTAKER LAW, LLC
1431 Walnut Street
Cincinnati, Ohio 45202
(513) 259-3758
(513) 436-0698 Fax
Justin@WhittakerLawFirm.com

Trial Counsel for
Plaintiff GPat Patterson, Ph.D.