IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GPAT PATTERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 5:22-cv-02052-JRA |
| | ) |
| KENT STATE UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO CITE SUPPLEMENTAL AUTHORITY**

Defendants, Kent State University, Mandy Munro-Stasiuk, Ph.D., and Julie Mazzei, Ph.D., by and through undersigned counsel, respectfully submit this *Response* to Plaintiff's *Motion for Leave to Cite Supplemental Authority* (Doc #: 97) (hereinafter, Plaintiff's "*Motion*").

At the onset, Defendants do not necessarily oppose Plaintiff's act of *citing* to what Plaintiff perceives to be supplemental authority. However, Plaintiff's filing in this case goes well beyond citing to supplemental authority and attempts to re-open briefing on the parties' cross-motions for summary judgment with an additional seven (7) pages of substantive argument (Doc #: 97, PageID#: 5609-5615). On this basis alone, Plaintiff's *Motion* should be denied. *See, e.g.*, *Rossi v. Gurstel Law Firm, P.C.*, 2020 WL 2542834, *1 (W.D. Wis. May 19, 2020) ("Gurstel moved for leave to file a so-called notice of supplemental authority, […], which was actually a substantive brief comparing the facts at hand to those in [the case cited as supplemental authority]. The court will deny the motion, […].").

While Defendants oppose Plaintiff's attempt to re-open summary judgment briefing at this late stage, they must of necessity respond to Plaintiff's argument on the merits, which

1

significantly misapplies the factually off-point decision in *Noble v. Cincinnati & Hamilton Cnty. Pub. Library*, 6th Cir. No. 23-3853, 2024 WL 3734296 (Aug. 9, 2024) (hereinafter, "*Noble*") to this case. For the reasons that follow, and to the extent this Court entertains Plaintiff's *Motion*, it should conclude that *Noble* fails to advance any of Dr. Patterson's arguments on their claim for First Amendment Retaliation.

**ARGUMENT**

**1.     *Noble* is factually distinguishable.**

At the onset, Defendants will point out the obvious. *Noble* does not arise in a public university setting and does not involve public university professors. Instead, the plaintiff in *Noble* was a security guard at a public library. *Noble* at *1. Moreover, and unlike Dr. Patterson in this case, the *Noble* plaintiff was actually terminated by his employer. *Noble* at *2. Dr. Patterson has never been terminated. *See* Patterson Dep. Vol. I (Doc #: 56, PageID #: 965). Nor has Dr. Patterson ever been suspended, demoted, or had their pay reduced. *Id.* To the contrary, Dr. Patterson was actually being *promoted* while the events of this case were unfolding. *See* Patterson Dep. Vol. I (Doc #: 56, PageID #: 966) (acknowledging that they were promoted to the rank of Associate Professor and granted indefinite denture in the spring of 2021).

*Noble* also dealt with one "meme" that did not originate with the Plaintiff but was simply re-posted by him (without comment) on his Facebook page for less than 24 hours. *Noble* at *2. The "meme" in question was voluntarily removed from the Plaintiff's Facebook page before anyone at the library contacted him about it. *Noble* at *2. It was also undisputed that the *Noble* Plaintiff's post did not—expressly or implicitly—refer to any of his colleagues at the library, to the library administration, or any internal library personnel matters.

In this case, by contrast, Dr. Patterson personally published several "tweets" during the months of June and July 2021 that complained about internal University personnel matters, such

as who would chair committees that were being formed to revamp the University's Center for the Study of Gender and Sexuality (the "Center") and develop an academic major in gender studies (the "Gender Studies Major"). *See* Munro-Stasiuk Dec. (Doc #: 69, PageID #: 4205-4206) (collecting Dr. Patterson's tweets). Unlike the *Noble* plaintiff's meme, Dr. Patterson's tweets (at least implicitly) referred to Dr. Patterson's colleagues at Kent State as "cishet white ladies" with "zero content experience" who were engaged in "epistemic violence," "fuckery" and "shit." *Id.* Dr. Julie Mazzei, in particular, was identified by Dr. Patterson as a "usurper" whose academic discipline (political science) is a "sentient trash heap." *Id.*; *see also* Plf.'s Responses to Mazzei First Interrogatories (Doc #: 60, PageID #: 1964-65) (acknowledging that "cishet white ladies" refers to Dean Munro-Stasiuk and Dr. Mazzei and "usurper" refers to Dr. Mazzei); Munro-Stasiuk Dep. (Doc #: 73, PageID #: 4821-22) (testifying that Dean Munro-Stasiuk understood Dr. Patterson's tweet about political science being a "sentient trash heap" as a "slight" to Dr. Mazzei based on Dr. Mazzei's discipline).

In light of the significant differences between the facts of *Noble* and the facts of this case, Plaintiff's contention that *Noble* is "squarely on point" with the instant matter is fundamentally flawed. Accordingly, it is no surprise that Plaintiff's *Motion* grossly overstates the legal implications that *Noble* may have on the issues pending before the Court, including whether Dr. Patterson's speech addressed a matter of public concern and whether Dr. Patterson's interests in speaking outweigh the University's efficiency interests. These will each be addressed in turn.

**2.** ***Noble* does not support Plaintiff's argument that Dr. Patterson's tweets addressed a matter of public concern.**

The *Noble* Court held that the plaintiff in that case spoke on a matter of public concern when he re-posted a "meme" that was critical of protests associated with the Black Lives Matter movement. The "meme" in question depicted a vehicle running into a crowd of stick figure

3

protestors, while the text surrounding the image read, "ALL LIVES SPLATTER" and "NOBODY CARES ABOUT YOUR PROTEST." *Noble* at *2. While the Sixth Circuit noted that this message was "shocking" and "crude," it held "there is no question that [Noble] spoke to a matter of public concern—namely, whether the alleged violent and destructive tactics of BLM were appropriate means to protest the deaths of George Floyd and others." *Noble* at *4.

In reaching this conclusion, the *Noble* Court recognized the important distinction between speech that addresses "a matter of public concern" and speech that simply advances "a personal grievance." *Noble* at *4. In this case, Dr. Patterson's speech falls squarely within the latter category. In particular, Dr. Patterson's tweets complained about internal University personnel matters, such as who should chair committees related to the Center and the Gender Studies Major. *See* Munro-Stasiuk Dec. (Doc #: 69, PageID #: 4205-4206) (collecting Dr. Patterson's tweets). Dr. Patterson's tweets did not claim that any of the University's internal personnel decisions were discriminatory. Nor did Dr. Patterson's tweets comment on issues of public concern such as protests, pending legislation, or the treatment of transgender persons generally. Instead, Dr. Patterson took issue with the academic pedigree of University administrators who Dr. Patterson believed were not qualified to lead the University's efforts regarding the Center and the Gender Studies Major. *See* Patterson Dep. Vol. III (Doc #: 58, PageID #: 1922, 1927). As already explained by Defendants in their dispositive motion briefing, these purely personal grievances are not matters of significant public interest. *See* Defs.' Br. in Opp. to Plf.'s Mtn. for Partial Summary J. (Doc #: 77, PageID #: 5066-5071) (collecting numerous authorities holding that professors' complaints about internal university personnel matters do not address issues of public concern).

In sum, and unlike the meme in *Noble*, none of Dr. Patterson's tweets expressed Dr. Patterson's "views on a social and political topic that was active throughout the nation at that

4

time." Plf.'s Mtn. for Leave to Cite Supp. Authority (Doc #: 97, PageID #: 5611). That being so, *Noble* does not lend any support to the argument that Dr. Patterson's speech was constitutionally protected.

3. ***Noble* does not diminish the University's interests in promoting the efficiency of the public services it performs.**

Even if the Court were to conclude that Dr. Patterson's complaints about internal University personnel matters were of legitimate public concern, Dr. Patterson's interests in airing those complaints is outweighed by the University's interests "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Tp. High School Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968). Defendants have already explained why in their prior dispositive motion briefing. *See* Defs.' Br. in Opp. to Plf.'s Mtn. for Partial Summary J. (Doc #: 77, PageID #: 5072-5074).

While the *Noble* Court held that the *Pickering* balancing test favored the plaintiff in that case, this was because "[t]here [was] no evidence that Noble took his politics to work or that his views on the BLM protests or any other political matter ever interfered with how he performed his job." *Noble* at *5. Accordingly, "the Library could not have reasonably expected that Noble's post would incite disruption." *Id.* at *7. Here, by contrast, there is an abundance of evidence that Dr. Patterson's barrage of online attacks targeting the competence and character of their colleagues (in particular, Dean Munro-Stasiuk and Dr. Mazzei) *did* have an impact in the workplace and interfered with the collaborative process for re-imagining the Center and developing the Gender Studies Major.

By way of example, and after seeing Dr. Patterson's tweets, Dean Murno-Stasiuk no longer felt as though she could collaborate with Dr. Patterson on these important initiatives. *See* Munro-Stasiuk Dec. (Doc #: 69, PageID #: 4207-4210). Additionally, and after Dr. Mazzei was

5

approached by a colleague who was concerned about Dr. Patterson's hostile communications, she specifically complained to the Dean that "continuing [collaboration with Dr. Patterson] is unhealthy for the potential program and school, at this point. It's clearly having an impact. I have concerns." *Id.* (Doc #: 69, PageID #: 4210). Dr. Patterson's rhetoric about the Dean and Dr. Mazzei also permeated Dr. Patterson's communications with other professors. In emails with Prof. Lauren Vachon and Prof. Suzanne Holt, for example, Dr. Patterson claimed that "the entire notion of an outsider to WGS [i.e., Dr. Mazzei] chairing a committee for the major feels just too institutionally violent for me to consent to," and threatened that if "Julie [Mazzei] digs in her heels and insists on chairing the WGS committee, I'm out completely." Patterson Dep. Vol. I at Exh. V (Doc #: 56-21, PageID #: 1323-24). In other words, Dr. Patterson was threatening to blow up the entire process of collaborating with the Dean and Dr. Mazzei to re-imagine the Center and develop the Gender Studies Major based on Dr. Patterson's personal grievances over who should lead the effort. *See* Patterson Dep. Vol. I (Doc #: 56, PageID #: 1155) (testifying that Dr. Mazzei's role in chairing committees related to the Center and Gender Studies Major was so offensive to Dr. Patterson that it would require them to completely withdraw from participation in the effort).

These facts bear directly on the factors that *Noble* instructs this Court to consider, i.e., the need to promote "harmony among co-workers," whether the speech "has a detrimental impact on close working relationships for which confidence and personal loyalty are necessary," the extent to which the speech "interferes with regular operations of the enterprise," and the threat of "undermin[ing] the [University's] mission." *Noble* at *5. There is no question that in this case, Dr. Patterson's attacks on Dean Munro-Stasiuk and Dr. Mazzei, both of whom Dr. Patterson would have had to collaborate with in connection with the Center and the Gender Studies Major, had a detrimental impact on close working relationships and interfered with the University's

6

operations. Indeed, and at the time the Dean rescinded Dr. Patterson's proposed credit load reallocation, she told Dr. Patterson that, "We, […], need to find a better way to have us all work together." Munro-Stasiuk Dec. at Exh. P (Doc #: 69-16, PageID #: 4269). The fact that the Dean contemporaneously expressed concerns over the very interests that *Pickering* protects from disruptive employee speech only confirms the need to balance those interests in the University's favor. Indeed, no less of an authority than the Supreme Court has held that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate," and that an employer like the University need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick v. Myers*, 461 U.S. 138, 151–52 (1983).

Because Dr. Patterson's speech unquestionably had a detrimental impact on close working relationships and interfered with the University's operations when it came to the Center and the Gender Studies Major, the *Pickering* test favors the University even if Dr. Patterson's speech involved a matter of public concern.

**4.      Even if *Noble* supported Plaintiff's position in this case, Dean Munro-Stasiuk would still be entitled to qualified immunity.**

Finally, and even if Dr. Patterson's speech addressed matters of public concern and Dr. Patterson's interests in speaking were not outweighed by the University's efficiency interests, Dr. Patterson's First Amendment claim would nonetheless fail in light of Dean Munro-Stasiuk's entitlement to qualified immunity. *See* Defs. Br. in Opp. to Plf.'s Mtn. for Partial Summary J. (Doc #: 77, PageID #: 5078-5081) (articulating the Dean's qualified immunity argument).[1]

---

[1] Additionally, and for the reasons previously articulated in Defendants' dispositive motion briefing, the University is entitled to Eleventh Amendment sovereign immunity on Plaintiff's First Amendment claim. *See* KSU Mtn. for Summary J. (Doc #: 70-1, PageID #: 4380-4381).

*Noble* does not address whether any of the defendants in that case were entitled to qualified immunity. Regardless, *Noble* does not help Dr. Patterson overcome Dean Munro-Stasiuk's qualified immunity argument for at least two reasons. First, and insofar as it was decided *after* the events of this case, *Noble* cannot "clearly establish" the law applicable to Dean Munro-Stasiuk's actions in the summer of 2021. *See Kisela v. Hughes*, 584 U.S. 100, 107 (2018) (holding, "a reasonable officer is not required to foresee judicial decisions that do not yet exist […]."); *Brosseau v. Haugen*, 543 U.S. 194, 200 n. 4 (2004) ("The parties point us to a number of other cases in this vein that postdate the conduct in question, […]. These decisions, of course, could not have given fair notice to Brosseau and are of no use in the clearly established inquiry.").

Second, the dissimilar facts of *Noble* preclude reliance on the Sixth Circuit's application of the *Pickering* balancing test in that case to "clearly establish" the law for purposes of Dr. Patterson's First Amendment claim. Indeed, courts have consistently recognized that "[i]n the First Amendment employment context, […] the *Pickering* analysis turns on a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of qualified immunity." *Akridge v. Wilkinson*, 351 F.Supp.2d 750, 767 (S.D. Ohio 2004), *aff'd,* 178 Fed.Appx. 474 (6th Cir.2006); *see also Devlin v. Kalm*, 531 Fed.Appx. 697, 707 (6th Cir.2013) ("*Pickering* requires a 'context-intensive, case-by-case balancing analysis' from which it is difficult to draw clearly established principles of law."); *Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389, 398 (8th Cir.1995) ("When *Pickering's* fact-intensive balancing test is at issue, the asserted First Amendment right 'can rarely be considered 'clearly established' for purposes of the Harlow qualified immunity standard.'").

Indeed, when comparing the facts of *Noble* to the facts of this case, it becomes readily apparent that the Sixth Circuit's application of a fact-intensive balancing test to a library security

8

guard who posted a single meme for less than twenty four hours and did not cause any disruption in the workplace is of little assistance when it comes to addressing the entirely different interests implicated by a university professor publishing multiple social media posts that attack the competence and character of their colleagues and threaten future collaboration among faculty members. *See Guercio v. Brody*, 911 F.2d 1179, 1184 (6th Cir.1990) (recognizing that at the qualified immunity stage, the question is "whether [the plaintiff's] rights under *Pickering*, **as opposed to whether the general teachings of *Pickering***, were so clear at the time in question that reasonable minds could not differ on the constitutionality of" the employer's action) (emphasis added). For this reason, and for all the reasons given in Defendants' prior dispositive motion briefing, Dean Munro-Stasiuk remains entitled to qualified immunity *even if* the Court were to conclude that *Noble* supports Dr. Patterson's position in this case.

## CONCLUSION

Plaintiff's citation to *Noble* does nothing to advance their arguments on the First Amendment issues pending before the Court. Accordingly, and even if the Court entertains Dr. Patterson's *Motion*, it should proceed to grant Defendants' *Motion for Summary Judgment* and deny Dr. Patterson's *Motion for Summary Judgment*.

9

Dated: August 23, 2024                    Respectfully submitted,

                                                        DAVID A. YOST (0056290)
                                                       Attorney General of Ohio

                                                       /s/ *Daniel J. Rudary*
                                                       Daniel J. Rudary (0090482)
                                                       **BRENNAN, MANNA & DIAMOND, LLC**
                                                       75 E. Market Street
                                                       Akron, OH  44308
                                                       Phone:          (330) 253-5060
                                                       Fax:             (330) 253-1977
                                                       E-mail:         djrudary@bmdllc.com

                                                       *Special Counsel for Defendants Kent State University, Mandy Munro-Stasiuk, Ph.D., and Julie Mazzei, Ph.D.*

### CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of August 2024 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Daniel J. Rudary*
*Special Counsel for Defendants Kent State University, Mandy Munro-Stasiuk, Ph.D., and Julie Mazzei, Ph.D.*

4861-7110-1147, v. 1