## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

GPAT PATTERSON, Ph.D.,               )        CASE NO: 5:22-cv-02052
                                     )
                                     )
        Plaintiff,                   )        JUDGE JOHN ADAMS
                                     )
v.                                   )        **MEMORANDUM OF OPINION**
                                     )        **AND ORDER**
KENT STATE UNIVERSITY, et.al,        )
                                     )        **(Resolves Docs, 70, 71, 75, 90, 97)**
        Defendant.                   )

Pending before the Court are the parties' cross motions for summary judgment. Specifically, Defendant Kent State University's moved for summary judgment as to the claims brought against it: Count I, Discrimination and Retaliation in violation of Title VII; Count IV, Perceived Disability Discrimination in violation of the Rehabilitation Act; Count V, First Amendment Retaliation pursuant to 42 U.S.C. §1983. Doc. 70. Defendants Julie Mazzei and Mandy Munro-Stasiuk also moved for summary judgment as to the claims brought against them: Count II, Denial of Substantive and Procedural Due Process under the Fifth and Fourteenth Amendment pursuant to 42 U.S.C. §1983; Count III, Denial of Equal Protection under the Fourteenth Amendment pursuant to 42 U.S.C. §1983, and Count V, First Amendment Retaliation pursuant to 42 U.S.C. §1983.  Doc. 71.  Plaintiff GPat Patterson, Ph.D. has moved for partial summary judgment against Defendant Munro-Stasiuk on Count V, and against Defendant Kent State on Count IV. Doc. 75.

Also pending are Plaintiff's motion to strike/disregard Defendant Munro-Stasiuk's declaration and other evidence, Doc. 90, and Plaintiff's motion for leave to cite supplemental authority, Doc. 97.

Upon review, the Court DENIES Plaintiff's partial motion for summary judgment, Doc. 75, GRANTS Defendants Munro-Stasiuk and Mazzei's motion for summary judgment, Doc. 71, and GRANTS Defendant Kent State's motion for summary judgment, Doc. 70. Plaintiff's motion to strike and for leave to file supplemental authority are DENIED as moot. Docs. 90, 97. The matter is hereby DISMISSED.

## I.     FACTS

The parties' briefing has made it clear to the Court that the issues herein are highly personal and important to all those involved. However, the Court is mindful that its task is strictly limited to reviewing the specific arguments and facts set forth by the parties and applying the law properly to those facts.

This action arises out of Plaintiff's employment with Defendant Kent State University ("Kent State") from 2018 to the present. Doc. 37-1, p. 6. Although Plaintiff has provided this Court with their detailed experiences while employed at Kent State, the relevant facts to this Court's analysis are as follows:

Plaintiff is an openly transgender person who uses "they", "their," and "them" pronouns, and has openly expressed their gender identity at all times. Doc. 37-1, p. 1, 2. Plaintiff has a master's degree in English Literature, a doctorate in Sexuality, Gender, and Rhetoric, and a graduate certificate in Women's, Gender, and Sexuality Studies. Doc. 37-1, p. 4. Kent State is a public institution of higher learning with campuses in Kent and throughout Northeast Ohio. Doc. 70-1, p. 1. Plaintiff is a tenured Associate Professor of English at Kent State's Tuscarawas, Ohio campus. Doc. 37-1, p. 6.

Defendant Munro-Stasiuk is the Dean of Kent State's College of Arts and Sciences ("the College"). Doc. 72, p. 7. Within the College sits the School of Multidisciplinary Social Sciences

and Humanities ("the School") which was established in 2020.  Doc. 72, p. 13, 14. The English Department is also within the College. Doc. 72, p. 14.  Julie Mazzei is the Director of the School. Id. Within the School sits the Center for the Study of Gender and Sexuality ('the Center"). Doc. 72, p. 16. The Center was formed six or seven years ago and in 2020 was in the process of being reimagined. Doc. 72, p. 20. There is a steering committee to reimagine the Center. Doc. 72, p. 16. In 2020, the College was creating the new School, reimaging the Center, and creating a new major (Gender and Sexuality Studies- Undergraduate) ("the Major") that would live in the Center. Doc. 72, p. 21-22.

In March of 2021, Plaintiff reached out to Munro-Stasiuk to express interest in working with the Center and with the ongoing development of the Major. Doc. 56, p. 91. Plaintiff and Munro-Stasiuk met on March 11, 2021 to discuss Plaintiff's interest.  Doc. 57, p. 406. The parties differ on what happened at that meeting, however, relevant to this Court's discussion, the possibility of Plaintiff directing the Center was raised. Doc. 59-1, p. 1. Further, Munro-Stasiuk recommended that Plaintiff initiate the tenure transfer process to the Kent campus with the Tuscarawas campus Dean Brad Bielski. Doc. 37-1, p. 10. This tenure transfer would have been from the English Department on the Tuscarawas campus to the new School on the Kent campus. Doc. 37-1, p. 10; Doc. 53, p. 8. In the meantime, Munro-Stasiuk offered to "buy out" some of Plaintiff's credit hours to work on developing the Major. Doc. Doc. 57, 406; Doc. 69, p. 6. This "buy out" is also known as a "load lift" or "load reallocation." Doc. 70-1, p. 3. Full time tenure track faculty have a teaching load of 24 credit hours per academic year. Doc. 67, p. 2. Munro-Stasiuk's offer would cut Plaintiff's teaching load in half to accommodate their work on developing the Major.  Plaintiff, Munro-Stasiuk and Mazzei communicated throughout the spring of 2021 on these issues.

3

On June 2, 2021, Mazzei emailed Plaintiff regarding a firm plan for the load reallocation, indicating that Plaintiff's load reallocation would cover the work that needed to be done "in the weeds" regarding the development of the Major, and that Mazzei would "mediate/moderate/lead" the committee developing the Major and the committee reimaging the Center. Doc. 68-4, p. 1. Mazzei informed Plaintiff that the Major committee would consist of approximately ten other individuals. Doc. 68, p. 5. In response, on June 3, 2021, Plaintiff asked if Munro-Stasiuk was still considering them to direct the Center, Doc. 68-85, to which Mazzei responded that Munro-Stasiuk thought Plaintiff was a great candidate, but they must move through the process and she was not certain how the new director would be chosen, Doc. 68-6.  On June 7, 2021, Plaintiff responded indicating that they were uncomfortable with additional conversations about the terms of the buyout and role regarding the Major and Center were happening without them in the room.  Doc. 68-7.  At this point, according to Mazzei, it was becoming evident that Plaintiff wanted to lead the development of the Major and the reimagining of the Center. Doc. 68, p. 6.

On June 16, 2021 Plaintiff began posting on social media about their frustration at not being given a leadership role on the two committees. Doc. 72-18; Doc.73-22, p. 20.  On July 6, 2021, Plaintiff emailed Professors Lauren Vachon (LGBTQ Studies program coordinator) and Dr. Suzanne Holt (Women's Studies program coordinator), indicating they were "out completely" if Mazzei "insists on chairing the WGS committee".  Doc. 56-21; Doc. 56, p. 219; Doc. 68, p. 3. On July 9, 2021, Dr. Holt met with Mazzei and expressed concern about Plaintiff's apparent "downward spiral of negative and accusatory communications." Doc. 68, p. 9, 11. Mazzei passed this concern along to Munro-Stasiuk.  Id.

Plaintiff never initiated the tenure transfer process from the English Department on the Tuscarawas campus to the new School on the Kent campus. Doc. 56, p. 113. Instead, on July 13,

2021, Plaintiff initiated tenure transfer discussions with the Chair of the English Department to transfer from the English Department on the Tuscarawas campus to the English Department on the Kent campus ("the English Department transfer").  Doc. 37-1, p. 15.

On July 19, 2021, Munro-Stasiuk emailed Plaintiff to inform them that she was rescinding her load reallocation offer.  Doc. 69-16. Plaintiff did not respond.  In August of 2021, Plaintiff resigned all their Kent State service commitments on the Tuscarawas and Kent campuses.  Doc. 57, p. 338-41.

On September 1, 2021, Plaintiff submitted the English Department tenure transfer request. Doc. 37-1, p. 16. As part of the transfer process, on September 13, 2021, the request went before the Tuscarawas campus' Faculty Advisory Committee ("FAC") which approved Plaintiff's transfer request. Doc. 37-1, p. 16; Doc. 66, p. 3. On September 24, 2024, the English Department Chair convened the Kent campus English Department FAC and Reappointment, Tenure, and Promotion ("RTP") Committees to vote on Plaintiff's transfer request. The RTP committee voted against Plaintiff's transfer request and the FAC adopted those results and rejected the transfer request. Doc. 37-1, p. 16; Doc. 67, p. 5; Doc. 66, p. 4. The English Department Chair informed Munro-Stasiuk of the results. Doc. 66, p. 5. Munro-Stasiuk concluded that the September 24, 2024 vote did not align with Kent State policy because the policy required separate votes by the RTP and the FAC Committees. Id. Based on these procedural concerns, on October 1, 2021, a second meeting and vote took place on Plaintiff's tenure request. Id. At the conclusion of the meetings, both the RTP and the FAC Committees voted against Plaintiff's transfer request. Id. The English Department Chair communicated these results to Munro-Stasiuk. Id.

On September 28, 2021, Plaintiff was formally invited to participate on the committees to reimagine the Center and to develop the Major.  Doc. 57, p. 365-66.  Plaintiff did not respond. Id.

5

On January 24, 2022, Plaintiff filed a Charge of Discrimination with the Ohio Civil Rights Commission. Doc. 56-22. Plaintiff filed the instant lawsuit on November 14, 2022. Doc. 1.

## II.    LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law * * *.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–944 (6th Cir. 1990).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–1480 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

The burden of production for the movant is to identify which portions of the evidence "demonstrate the absence of a genuine issue of material fact" regarding an essential element or, alternatively, to demonstrate a showing that there is "literally no evidence in the record" in support of an essential element of the other party's initial claim. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323, 332 (1986). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. [1]

## III.   LAW AND ANALYSIS

### A.   Count I: Discrimination and Retaliation Base on Sex under Title VII- Kent State

Plaintiff captions their First Count as one of "discrimination and retaliation based on sex, gender, gender identity, and gender expression" against that Kent State in violation of Title VII, 42 U.S.C. §2000, et seq. Doc. 37-1, p. 21. Specifically, Plaintiff contends that Kent State discriminated against them as an openly transgender person, resulting in several adverse actions. Doc. 37-1, Doc. 85-1, p. 16. Although captioned as both a discrimination and retaliation claim, Count I does not set forth any allegations of retaliation. Notably,

> The elements of a retaliation claim are similar but distinct from those of a discrimination claim. To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.' *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003), and *Burlington N.*, 548 U.S. at 67-68 (modifying the third element to require a 'materially adverse action' rather than an 'adverse employment action')). Title VII

---

[1] The briefing in this case is voluminous. The parties regularly refer the Court to not only various sections throughout their brief but also to sections of other motions/briefing elsewhere in the case. While the Court recognizes the heightened emotions that are at play, the parties have spent significant time setting forth their own recitation of the facts rather than focus on the issues at hand. As a result, many of the arguments are given short shrift. The Court will not extrapolate arguments from alternative argument sections or hunt for supporting facts/evidence from the fact sections of the brief in order to make sense of the parties' arguments.

> retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.' *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013).

*Laster v. City of Kalamazoo*, 746 F.3d 714, 730-731.  Count I does not assert that Plaintiff engaged in a protected act, let alone what that protected act was, or that Kent State was aware of any alleged protect act. Doc. 37-1, 21-24.  Because retaliation was not pled, there is nothing for the court to analyze. The claim simply does not exist. Any attempt to remedy this deficiency through briefing or by pointing to discovery responses is an inappropriate way to amend the complaint. Accordingly, the Court turns to Plaintiff's discrimination claim.

To establish employment discrimination pursuant to Title VII, a plaintiff must either provide direct evidence of discrimination or establish a prima facie case, which creates an inference of discrimination based on circumstantial evidence. *Seay v. Tennessee Valley Authority*, 339 F.3d 454, 463 (6th Cir. 2003). Under either a direct or circumstantial analysis, Plaintiff "still must establish that she suffered an adverse employment action in order to state a claim." *Vredevelt v. GEO Group, Inc*., 145 F. App'x 122, 128 (6th Cir. 2005). Accordingly, regardless of whether Plaintiff proceeds on the basis of direct evidence or circumstantial evidence, they must demonstrate that they suffered an adverse employment action as a result of the alleged discrimination. *Crane v. Mary Free Bed Rehab. Hosp*., 634 Fed. Appx. 518, 522 (6th Cir. 2015).

### 1.    Adverse Action

An adverse employment action is a "'materially adverse change in the terms and conditions of [plaintiff's] employment.'" *Momah v. Dominguez*, 239 Fed. App'x. 114, 123 (6th Cir. 2007), (quoting *Hollins v. Atlantic Co*., 188 F.3d 652, 662 (6th Cir. 1999) and *Kocsis v. Multi-Care Mgmt., Inc*., 97 F.3d 876, 885 (6th Cir. 1996); *Mitchell v. Vanderbilt Univ*., 389 F.3d 177, 182,

(6th Cir. 2004). A materially adverse change is "typically characterized 'by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Momah*, 239 Fed. App'x at 123 (quoting *Hollins*, 188 F.3d 662). De minimis employment actions are not materially adverse and therefore not actionable. *Mitchell*, 389 F.3d at 182. Plaintiff points to four alleged adverse actions which this Court will address in turn. Doc. 85-1, p. 16.

### a)      Revocation of Load Lift on July 19, 2021

In the spring of 2021, Munro-Stasiuk proposed reducing Plaintiff's "teaching load by fifty percent to accommodate their work with the current Women's Studies and LGBT studies faculty, and to focus their work on building the CGGS academic degree proposal, and the CSGS Program itself." ("the Load Lift") Doc. 37-1, ¶48. On July 19, 2021, Munro-Stasiuk informed Plaintiff that she was not moving forward with the Load Lift. Doc. 37-1, ¶71. Plaintiff contends that Munro-Stasiuk's decision to rescind her Load Lift offer was a demotion and therefore an adverse action. Doc. 85-1, p. 22.

Kent State contends that it is undisputed that the Load Lift was merely a "reapportionment of a faculty member's 24-per-year (or 12-per-semester) credit hours that has no impact on salary, benefits, rank, or title." Doc. 70-1, p. 10. Kent State points to the declaration of Kevin West, Kent State's Associate Provost, Faculty Affairs, who explains that all full-time tenure-track faculty like Plaintiff have a teaching load of 24 credit hours per academic year.  Doc. 67, p. 2. Further, University policy states that all full-time faculty is expected to perform University service, such as committee work, as part of their normal service.  Id. The policy provides that, in certain cases, when the service load is heavy, a portion of the faculty member's 24 credit hours may be reallocated from teaching to service.  Doc. 67, p. 3. "This reallocation does not entail any increase

in compensation or benefits for a faculty member.  Nor does it affect a faculty member's rank or title.  Rather this is an internal reallocation of job responsibilities from teaching to some aspect of University service." Id.  Faculty members are not entitled to a Load Lift, and the decision is at the sole discretion of the vice president for academic and student affairs or the collegial dean. Id.

Plaintiff testified that the Load Lift would reallocate their teaching hours "such that instead of teaching certain credit hours, those hours are now assigned to an element of university service[.]" Doc. 53, p. 114. They confirmed that there was no change in monetary compensation and no title change. Doc. 53, p. 115.

Plaintiff does not point to anything to contest Kent State's assertion that the Load Lift did not result in any change in salary, benefits, rank or title.  Instead, Plaintiff asserts that the recission of the Load Lift was a "demotion" because they would have "diminished responsibilities."  Doc. 85-1, p. 22-24.

> Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by 'salary or work hour changes.' See *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996) (holding that a job transfer was not an adverse employment action because the plaintiff 'enjoyed the same . . . rate of pay and benefits, and her duties were not materially modified'). And even if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' *Id*. at 886 (citation omitted).

*Famurewa v. Mich. Dep't of Treasury*, 2011 U.S. Dist. LEXIS 127518, *10, (N.D. Ohio Oct. 6, 2011) (quoting, *Spees v. James Marine, Inc*., 617 F.3d 380, 390-391 (6th Cir. 2010).

Plaintiff does not explain how a reallocation from service hours to teaching hours results in "diminished" responsibilities rather than merely "different" responsibilities.[2] Doc. 85-1, p. 22-24. Plaintiff's subjective desire to reallocate some of their time from teaching to service does not mandate a finding that the denial was an adverse action. "[A]n individual's 'subjective impression concerning the desirability of one position over another' is insufficient to render an employer's action materially adverse. *Mitchell*, 389 F.3d at 183; see also *Policastro v. Nw. Airlines, Inc*., 297 F.3d 535, 539 (6th Cir. 2002)." *Freeman v. Potter*, 200 Fed. Appx. 439, 442 (6th Cir. 2006).

Accordingly, there is no issue of material fact that the recission of the Load Lift did not result in a material adverse change in Plaintiff's employment, and therefore it is not an adverse action as a matter of law.

### b) The Refusal to Appoint to Leadership Positions

Plaintiff contends that Kent State barred them from a leadership role in the Center and in developing the Major. Doc. 85-1, p. 24. Kent State asserts that these leadership positions have no impact on salary, benefits, rank, or title and are merely an "alteration of job responsibilities" and not a promotion of any sort. Doc. 70-1, p. 10.

Plaintiff concedes that these potential leadership roles did not offer a change in compensation, a change in title, or a change in benefits. Doc. 56, p. 115, 195. Plaintiff contends summarily that "being deprived of an important leadership or supervisory role is materially adverse, particularly if that loss comes with diminished responsibilities." Doc. 85-1, p. 24.

---

[2] To the extent Plaintiff points to their expert report to establish the differences between full-time faculty on the Kent campus versus the branch campuses, this discussion is more applicable to Plaintiff's assertion that the denial of tenure transfer was an adverse action, rather than the reallocation of time between service and teaching and will be discussed below. Doc.85-1, p. 23.

11

Plaintiff does not point to any evidence to establish a genuine issue of material fact regarding their responsibilities at all, let alone that they would have been diminished. Plaintiff focuses on the "prestige" of the roles.  Doc. 56, p. 115.  After confirming that their compensation would not have changed had they been appointed to either role, Plaintiff explained "that does not necessarily have anything to do with the advancement or the honor and prestige that would have--and by 'prestige' I mean just by the foot in the door, but also the honor of being able to be trusted on my credentials to work on these things, and that, to me, matters just as much as pay."  Id.

> 'Prestige,' much like beauty, is in the eye of the beholder. It is the 'standing or estimation in the eyes of people.' WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986). Yet, because we rely upon objective factors, rather than subjective impressions, we must look underneath an assertion of 'prestige' to determine whether there is anything concrete to substantiate it. For example, does a particular title entail greater responsibilities, have unique characteristics, or require special training or education? See, e.g., *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (en banc)(noting that the higher level of qualifications needed for a position was an indication of the position's prestige), aff'd, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)(explaining that negative public perception alone does not amount to an adverse employment action).

*Potter*, 200 Fed. Appx. at 444-445. Plaintiff's argument on this issue is only two paragraphs long and does not point to any record evidence to substantiate their belief these roles were objectively prestigious thus constituting an adverse action. Doc. 85-1, p. 24-25. Accordingly, there is no issue of material fact that the decision not to appoint Plaintiff to these leadership roles did not result in a material adverse change in their employment, and therefore it is not an adverse action as a matter of law.

### c)    The Tenure Transfer Denial

Plaintiff asserts that the denial of their tenure transfer request from the Tuscarawas campus to the Kent campus was an adverse action.  Doc. 85-1, p. 16-21. At the outset, the Court notes that

this case involves two potential tenure transfers.  The first involved Plaintiff transferring tenure from the English Department on the Tuscarawas Campus to the new, not yet created, School of Multidisciplinary Social Studies and Humanities on the Kent Campus.  Doc. 37-1, p. 10-11. This transfer request, although discussed, was never made, and is therefore not at issue here. Doc. 56, p. 112. The second transfer request, at issue here, is Plaintiff's tenure transfer request from the English Department on the Tuscarawas Campus to the English department on the Kent Campus (the "English Department Transfer"). Doc. 85-1, p. 16.

Plaintiff asserts that the initial denial of their English Department Transfer on September 24, 2021 and the final denial on October 1, 2021 are two separate adverse actions.  Doc. 85-1, p. 16. Kent State asserts that no decision was made on the English Department Transfer on September 24, and that the decision was pending until a new hearing was held and the process was complete on October 1. Doc. 93, p. 6. Plaintiff's arguments regarding the two English Department Transfer request hearings focuses on what occurred at those meetings that resulted in the final decision to deny Plaintiff's English Department Transfer request.  Doc. 85-1, p. 16-21. While these facts are certainly relevant to a discrimination argument, they are not necessary to determine whether the ultimate decision, the denial of the English Department Transfer, resulted in an adverse employment action such that "there is evidence that the employee received 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' *Id*. at 886 (citation omitted)." *Famurewa*, 2011 U.S. Dist. LEXIS at *10, (quoting, *Spees,* 617 F.3d at 390-391.).

13

At issue here is not HOW the decision was made, but rather, if the decision itself amounts to an adverse employment action as to Plaintiff.  Accordingly, the Court addresses the English Department Transfer denial as one decision.[3]

Kent State asserts that the English Department Transfer request is a lateral employment move that would not have resulted in an increase of title, pay or benefits. Doc. 70-1, p. 18. According to University Policy 3324-6-14(N), "Tenured faculty members may transfer from one academic unit to another; from the regional campus system to an academic unit at the Kent campus, or from an academic unit at the Kent campus to the regional campus system[.]" Doc. 67-1, p. 119. Further, "a faculty member whose tenure transfers under this section will retain his/her rank."  Doc. 67-1, p. 120. Therefore, Plaintiff's English Department Transfer request "would not have resulted in a promotion in rank.  Dr. Patterson would have remained a tenured Associate Professor of English, regardless of the campus on which they taught." Doc. 67, p. 6. Plaintiff does not challenge this point. Doc. 85-1, p. 17.

Kent State argues that the English Department Transfer would not have resulted in a salary increase.  Doc. 70-1, p. 19. Specifically, there is no "difference in salary coming from a regional campus into the Kent campus." Doc. 61, p. 181.  Further, University Policy 3324-6-14 governing tenure transfers does not "provide for the automatic re-negotiation or adjustment of salary upon transfer of tenure." Doc. 67, p. 6.  In fact, salary adjustments are governed by the Collective Bargaining Agreement, under which "a faculty member may initiate a salary adjustment request

---

[3] There is no argument regarding any statute of limitation issues such that the actual date the decision was made is at issue.

14

during any given academic year no later than January 15." Id.  Plaintiff does not contend that they

sought a salary adjustment only that they sought the English Department Transfer.

Countering Kent State's argument, Plaintiff contends that there is a "pay disparity between

tenured faculty on the Kent Campus and their comparatively ranked counterparts on the regional

campuses, and thus a difference in benefits." Doc. 85-1, p. 18. In support, Plaintiff cites to a

presentation made by Deborah Smith, President of American Association of University Professors-

KSU, at a tenure track meeting stating that "lower average salaries by rank than Kent campus

Faculty" is a "known area of Regional Campus Faculty Concern[.]" Doc. 85-1, p. 18, quoting Doc

72-2, p. 3. Plaintiff further asserts that "the CBA differentiates between regional and Kent Campus

faculty when to comes to (i) across-the board raises (Article XII, §5), (ii) eligibility for presidential

excellence awards (Article XII, §3), (iii) per capita merit award pools (Article XII, §4), (iv)

promotion increments (Article XII, §6), and (v) salary floors.  Doc. 85-1, p. 18, citing Doc. 72-2,

at 4.  This is a disingenuous summary of the cited document.

The presentation begins with a slide noting that regional campus faculty are concerned

about salary discrepancies. Doc. 72-2, p. 3.  The very next slide explains that belief that salary

discrepancies are explained by the explicit contractual provisions to which Plaintiff points is a

MYTH.  "In fact, our CBA does not differentiate between [Regional Campus] and [Kent Campus]

faculty when it comes to" across the board raises, eligibility for President's Excellence Awards,

per capita merit award pools, promotion increments, salary floors by rank. Doc. 72-2, p. 4. The

next slide explains that the discrepancies result from the application of the salary minimum set

forth in the CBA.  "On the Kent campus, most faculty are offered starting salaries well above the

floor…. Unfortunately, [Regional Campus] deans seem to interpret the floor as a ceiling and rarely

offer starting salaries to [Regional Campus] Faculty higher than the floor." Doc. 72-2, p. 5.  This

15

presentation does not support Plaintiff's contention that a *transfer* of tenure would have resulted in a salary increase for them.

Plaintiff points to their expert, Jennifer Wingard, Ph.D.'s statement that "separate pools" "can lead to pay inequity between those who teach at the regional campuses vs. those who teach at [the Kent Campus]," however, this is not a statement asserting that a tenure transfer would result in higher pay. Doc. 85-1, p. 18.  Rather, this solidifies the above discussion that any perceived pay discrepancies begin at the OUTSET of employment, due to lower starting salaries. At her deposition, Dr. Wingard was asked "do you have any evidence from the documents you have reviewed to suggest that upon transfer of tenure, Professor Patterson from Tuscarawas campus to the Kent campus, Professor Patterson's salary would be renegotiated or increased?  … A: I don't know.  There is nothing about that in any of the documentation." Doc. 63, p. 53. Dr. Wingard further testified that she was not aware of any documentation that Plaintiff ever initiated a salary adjustment request. Doc. 63, p. 53.

Plaintiff does not point to any evidence to establish that the English Department Transfer would have resulted in higher compensation.

The bulk of Plaintiff's argument on this issue related to perceived lost opportunities and prestige.  Specifically, Plaintiff asserts that transfer to Kent campus "would have allowed them many more opportunities to advance their career, the denial of which is 'materially adverse.'" Doc. 85-1, p. 19, (citing *Leligon v. VA*[4], No. 17-3060, 2017 U.S. App. LEXIS 25019, at **13-14 (6th

---

[4] The Court notes that this citation is to a case discussing Title VII retaliation claim.  As noted above, the elements of discrimination and retaliation are similar but distinct.  *Burlington N.*, 548 U.S. at 67-68 (modifying the third element to require a 'materially adverse action' rather than an 'adverse employment action')). "The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.  We therefore reject the

Cir. Dec. 11, 2017)).  However, regarding advancement, to obtain a promotion from "Associate Professor" to "Full Professor" Plaintiff would have to meet the same criteria no matter on which campus they taught.  Doc. 61, p. 182-83. Regardless, Plaintiff does not claim that they were denied advancement or even an opportunity for advancement, nor do they provide any evidence of such. Plaintiff speaks in generalities and does not provide any evidence that these specific concerns are applicable in their case.  Plaintiff must show that *they* suffered an adverse employment action, not that they might in the future. Their argument instead is essentially that they might be denied an opportunity to potentially advance in the future.  Such a vague concern does not amount to an adverse employment action.

Plaintiff further argues that "teaching loads on the regional campuses are higher than at the Kent Campus." Doc. 85-1, p. 19. In sum, Plaintiff contends that

> Dr. Patterson's responsibilities on the Kent Campus would have been objectively and materially different.  There would have been more opportunities for pay increases, to do research, prestige, and to advance their career on the Kent Campus. They also would have a lighter teaching load."

Doc. 85-1, p. 21. Again, Plaintiff points to no evidence to establish that their teaching load would have been any different after the English Department Transfer.  In fact, they made clear that they did not want any involvement in the Center if they could not be in charge and therefore actively declined opportunities.  Plaintiff provides no evidence or argument about how their specific employment would be different from the Tuscarawas campus to the Kent campus.  Accordingly,

---

standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.' See supra, at___, 165 L. Ed. 2d, at 355, 126 S. Ct. 2405." *Burlington* 548 U.S. at 67. Thus, what might be a material adverse action for retaliation purposes does not automatically amount to an adverse action for Title VII discrimination purposes.

Plaintiff has failed as a matter of law to establish that any potentially discriminatory conduct resulted in an adverse action to satisfy a Title VII discrimination claim under either the direct or circumstantial evidence route.  Accordingly, Count I is DISMISSED.

**B.      Count II: Denial of Substantive and Procedural Due Process- Munro-Stasiuk and Mazzei**

In Count II, Plaintiff contends that Munro-Stasiuk and/or Mazzei deprived them of their rights to substantive and procedural due process in violation of the Fifth and Fourteenth Amendments. Doc. 37-1, p. 24. Munro-Stasiuk and Mazzei move for summary judgment on this claim, arguing in part:

> Dr. Patterson was not deprived of their right to substantive and procedural due process because Dr. Patterson has no constitutionally protected property interest in the credit load reallocation, committee assignments, Center directorship, and tenure transfer at issue in this case. Even if this Court were to hold that any of these alleged benefits constitutes a protected property interest, it cannot be disputed that the University and its administrators operated within the bounds of established academic norms and gave Dr. Patterson the process due to them.

Doc. 71-1.  Plaintiff does not oppose Munro-Stasiuk and Mazzei's motion for summary judgment on Count II.[5]  Doc. 85-1.  Further, although Plaintiff moved for partial summary judgment on some of their claims, they did not move for judgment on Count II.  Doc. 75.

Accordingly, Plaintiff has abandoned any claim that Munro-Stasiuk and Mazzei deprived them of their right to substantive and procedural due process.  See *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider

_____

[5] To the extent that Plaintiff makes a passing reference to the Fifth and Fourteenth Amendments in its opposition to Munro-Stasiuk's and Mazzie's Motion for Summary Judgment on Count III, IV, and V, it is not enough to survive this Court's conclusion that they have abandoned Count II.  Plaintiff does not even mention Count II.  At most, it is a perfunctory statement that does not save it from abandonment.

the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys*., 65 F. App'x 19, 24–25 (6th Cir. 2003) (stating that a plaintiff's failure to brief a claim in the district court is an abandonment of the claim); *Campbell v. Nally*, No. 2:10–cv–1129, 2012 WL 4513722, at *12 (S.D.Ohio Oct.1, 2012) (holding that a perfunctory statement in a summary judgment memorandum in opposition that "material facts remain in dispute" in regard to claims amounts to abandonment of those claims); *Murphy v. Ohio State Univ*., No. 2:11–cv–238, 2012 WL 4499027, at *4 (S.D.Ohio Sept.28, 2012) (explaining that a plaintiff's failure to present actual argument on a claim in a memorandum in opposition constitutes abandonment of that claim); *Colston v. Cleveland Pub. Library*, No. 1:12–CV–204, 2012 WL 3309663, at *2 n. 2 (N.D.Ohio Aug.13, 2012) (deeming a claim abandoned and granting summary judgment when a plaintiff "did not respond or even mention [the] claim in her oppositions to Defendants' motions for summary judgment"); *Thomas v. Starbucks Corp.*, No. 3:10–1158, 2012 WL 1900919, at *4 (M.D.Tenn. May 24, 2012) (holding that a district court can decline to consider a claim's merits when a plaintiff fails to address the claim in a summary judgment response). Count II is hereby DISMISSED.

### C. Count III, Denial of Equal Protection under the Fourteenth Amendment pursuant to 42 U.S.C. §1983- Munro-Stasiuk and Mazzei

Plaintiff contends that Munro-Stasiuk and Mazzei violated their right to equal protection under the Fourteenth Amendment "to be free from disparate treatment and discrimination based on sex, gender, gender identity, and gender expression in public employment," and "based on disability and perceived disability." Doc. 37-1, p. 26. Munro-Stasiuk and Mazzei move for

summary judgment on this claim, and Plaintiff does not.  Doc. 71-1, p. 12.  In opposition, Plaintiff captions their argument as follows: "When viewed in the light most favorable to Dr. Patterson, the Court must overrule the Motion for Summary Judgment of Dean Munro-Stasiuk and Dr. Mazzei on Counts III and IV, and on Count V for First Amendment retaliation." Doc. 85-1, p. 45. However, the entire argument is focused on their First Amendment claim.  They state no law relevant to an Equal Protection claim, no argument to counter Munro-Stasiuk and Mazzei's motion, let alone point to any evidence setting forth a genuine issue of material fact.  Accordingly, the Court concludes that Plaintiff has abandoned Count III for the same reasons set forth in Count II. Count III is hereby DISMISSED.

### D.      Count IV Perceived Disability Discrimination in violation of the Rehabilitation Act- Kent State

In Count IV, Plaintiff contends that Dr. Mazzei, Vachon, and others "coordinated to exclude Dr. Patterson from participating in the Center, they did so based on their perceptions of Dr. Patterson's 'mental health,' 'mental stability,' and the like. They therefore perceived Dr. Patterson as suffering from a 'disability' within the meaning of Section 504." Doc. 37-1, p. 31. Further, Plaintiff contends that "[b]y denying Dr. Patterson the ability to participate in the Center because of a perceived disability, the University excluded Dr. Patterson from participating in, denied the benefits of, and/or subjected them discrimination in violation of Section 504." Id.

To establish a violation of the Rehabilitation Act, Plaintiff must show: (1) that they are either disabled or perceived to be disabled within the definitions of the statutes; (2) that they were qualified to perform their job with or without a reasonable accommodation; (3) that they suffered an adverse employment action on the basis of their disability or perceived disability; (4) that their employer knew or had reason to know of their disability; and (5) that they were replaced or the

position remained open while their employer searched for alternate applicants. *Khatri v. Ohio State Univ.*, 2021 U.S. Dist. LEXIS 27571, *31 (N.D. Ohio Feb. 9, 2021).  Additionally, Plaintiff must establish that Kent State receives federal funds.  *Id*. The adverse action requirement under the Rehabilitation Act is the same as under Title VII.  For the reasons set forth above, Plaintiff has failed to establish they suffered from an adverse action.  Accordingly, Count IV is DISMISSED.

### E.   Count V, First Amendment Retaliation pursuant to 42 U.S.C. §1983- All Defendants

In Count V, Plaintiff contends that all Defendants retaliated against them for exercising their First Amendment right to free speech in violation of 42 U.S.C. §1983. Doc. 37-1, p. 31. Specifically, Plaintiff contends that Defendants retaliated against them for posting on social media by excluding them from participating in the Center and by denying their tenure transfer request. Id.

#### 1.   Kent State

Kent State moved for summary judgment[6] on this claim as a matter of law for two reasons: 1) it is entitled to Eleventh Amendment immunity because it is an arm of the state, and 2) because it is not a person amenable to suit under §1983.  Doc. 70-1, p. 29-30. In opposition, Plaintiff contends that Kent State's Eleventh Amendment immunity argument is tempered by the *Ex Parte Young* Doctrine. Doc. 85-1, p. 57. Plaintiff does not address Kent State's argument that it is not a person under §1983.

---

[6] Plaintiff does not move for summary judgment against Kent State on this Count. Doc. 75.

21

As a matter of law, Kent State is an arm of the State, and "is immune from suit under the Eleventh Amendment because it is well-settled that a plaintiff is precluded from directly suing a State in federal court" pursuant to §1983. *Johnson v. University of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000). Accordingly, Count V is DISMISSED as to Kent State.

### 2.    Munro- Stasiuk and Mazzei

The parties have filed cross motions on this claim. Doc. 71.1; Doc. 75[7].

To establish a prima facie First Amendment retaliation claim, Plaintiff must show the following: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) ... the adverse action was motivated at least in part by the plaintiff's protected conduct." *Rapp v. Putman*, 644 Fed.Appx. 621, 624 (6th Cir. 2016) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc)). If the plaintiff can establish a prima facie case, then the burden of proof then "shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Kline v. Portage Cty. Bd. of Comm'rs*, 5 F. Supp. 3d 902, 912 (N.D. Ohio 2014) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).

### a)    Adverse Action

To establish an adverse action for First Amendment retaliation purposes, "a plaintiff must show that the action 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)). But "[i]t is not necessarily true . . . that every action, no matter how small, is constitutionally cognizable" as an "adverse action."

---

[7] Plaintiff's motion for partial summary judgment only moves for summary judgment on Count V as to Munro-Stasiuk, with no reference to Mazzei. However, Munro-Stasiuk and Mazzei jointly move for summary judgment on this claim.

> *Thaddeus-X*, 175 F.3d at 396. In the employment context, "[t]he term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Dye*, 702 F.3d at 303 (alteration omitted) (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012)).

*Sensabaugh v. Halliburton*, 937 F.3d 621, 628 (6th Cir. 2019).  The Court recognizes that it must "tailor[] our analysis under the adverse action prong to the circumstances of this specific retaliation claim." *Sensabaugh*, 937 F.3d at 628, (quoting, *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005)).

In their Complaint on Count V, Plaintiff sets forth two adverse actions to establish retaliation. The first is that Munro-Stasiuk and Mazzei "coordinated and agreed" to "exclude Dr. Patterson from participating in the Center based on, and in retaliation for, the content of Dr. Patterson's speech[.]" Doc. 37-1, p. 32. The second alleged adverse action is that "Dr. Munro-Stasiuk coordinated with University decision-makers on the FAC and RPT Committee on behalf of the University, to deny Plaintiff's tenure transfer request to its Main Campus based on, and in retaliation for, the content of Plaintiff's speech[.]" Id. Plaintiff attempts to expand their specifically pled adverse actions to include recission of the Load Lift and the decision not to offer Plaintiff a leadership role in the Center.  Plaintiff cannot expand the bases for their pled claims on briefing. To do so would be an impermissible attempt to amend their complaint.  Thus, the Court limits its discussion to the adverse actions as pled in the Complaint. Doc. 37-1.

### (1)     *Participation in the Center*

The facts establish that Plaintiff was not "excluded" from participation in the Center. Doc. 56, p. 74; Doc. 58, p. 492. Rather, Plaintiff declined to participate because they would not be in charge or otherwise in a leadership role.  Id.

Q Did Julie Mazzei or Dean Munro-Stasiuk ever tell you you could not serve on either of the two committees?

A They did not.

Doc. 56, p. 75. Plaintiff confirmed that Mazzei invited them via email to participate in the "committee that was being formed to re-envision or reimagine the Center for the Study of Gender and Sexuality", and they did not respond to the email.  Doc. 57, p. 366.  Similarly, Plaintiff confirmed that Mazzei invited them via email to participate in the "committee being formed to develop the new major in gender and sexuality" and they did not respond. Doc. 57, p. 366.  Thus, the evidence establishes that Plaintiff was not excluded from participation in these committees, but rather chose not to participate.  The alleged adverse action did not occur.

Even if Plaintiff is correct and Munro-Stasiuk and Mazzei excluded them from *participation* in these committees, Plaintiff has failed to establish that such participation had a material affect on their employment so to qualify it as an adverse action. For First Amendment purposes, Plaintiff does not point to any evidence to establish that this action would "chill or silence a person of ordinary firmness." *Sensabaugh*, 937 F.3d at 628. In fact, Plaintiff does not even address the effect being barred from *participating* on a committee would have, but rather, focuses on the effect of not being allowed to *lead* the committee. Doc. 75, p. 18. Plaintiff explains that there is a "material difference in being allowed to participate or sit on committees versus leading them." Doc. 75, p. 18, citing Doc. 57, p. 438. Plaintiff contends summarily "the adverse action taken against Dr. Patterson would chill a person of ordinary firmness from continuing to speak, most obviously, because the direct consequences of their speech were being barred from leadership in the Center and the recission of their Load Lift." Doc. 75, p. 19.  Neither of these actions were the alleged adverse actions asserted in their Complaint on Count V.

24

Finally, even assuming Plaintiff pled that Munro-Stasiuk and Mazzie retaliated against them by not allowing them to Chair the committees, Plaintiff cannot establish causation.  Plaintiff confirmed that it was their "position that on June 2, 2021, you were informed that you would no longer be chairing the committees you refer to or that you were denied any and all participation in the center whatsoever[.]" Doc. 58, p. 476.  The social media posts at issue began on June 16, 2021 and were *about* the decision not to place them in a leadership role. Doc. 72-18; Doc.73-22, p. 20.  It is axiomatic that the June 2, 2021 email allegedly informing Plaintiff that they were no longer chairing the committee could not have been retaliation for social media posts that did not begin until June 16, 2021.

Accordingly, Plaintiff has failed to establish that 1) they were excluded from participating on the committees and that 2) even if correct, excluding them from participation on the committees was an adverse action in retaliation for protected speech as a matter of law.

### *(2)    Tenure Transfer*

Plaintiff contends that Munro-Stasiuk "coordinated with University decision-makers on the FAC and [RTP] Committee on behalf of the University, to deny Plaintiff's tenure transfer request." Doc. 37-1, p. 32.  However, Plaintiff concedes that they are not aware of any evidence that Munro-Stasiuk coordinated, communicated, or attempted to influence any decision maker to deny their transfer request in retaliation for their speech, as specifically alleged in Paragraph 168 of the Second Amended Complaint. Doc. 58, p. 520-21. In the section of their motion for summary judgment discussing the alleged adverse actions in their First Amendment retaliation claim, Plaintiff does not address this issue at all, let alone point to any evidence to establish that Munro-Stasiuk coordinated with decision makers to deny them a tenure transfer. Doc. 75, p. 17.

25

Accordingly, Plaintiff has failed to establish that Munro-Stasiuk retaliated against Plaintiff for protected speech by coordinating with decision makers to deny them a tenure transfer. as a matter of law.  Count V is hereby DISMISSED.

## IV.    CONCLUSION

Upon review, the Court DENIES Plaintiff's partial motion for summary judgment, Doc. 75, GRANTS Defendants Munro-Stasiuk and Mazzei's motion for summary judgment, Doc. 71, and GRANTS Defendant Kent State's motion for summary judgment, Doc. 70.  Plaintiff's motion to strike and for leave to file supplemental authority are DENIED as moot. Docs. 90, 97. The matter is hereby DISMISSED.

**IT IS SO ORDERED.**

DATE: September 26, 2024                    */s/ John R. Adams*
                                            Judge John R. Adams
                                            UNITED STATES DISTRICT COURT